in Action Legal Fund v. Perdue and the Montana Beef Council. So Appellant Mr. Muraskin. Thank you Your Honor. I may have pleased the court, David Muraskin for R-CALF USA. Through its beef checkoff program, the government compels beef producers to pay millions of dollars who use it for corporate advocacy of their own choosing. The only requirement is that that advocacy be consistent with the beef act. That is compelled subsidy of private speech and it's patently unconstitutional. Counsel do you concede that in light of the memoranda of understanding that has now been entered into between your department and I guess the Department of Agriculture and the various beef boards that the government has the authority if it chooses to exercise it to control every word of the advertising that is issued and paid for under the checkoff fund? No, that's precisely the issue that we're getting at. What happens is under those MOUs... You're saying the MOU doesn't give the department that authority even if it chooses not to exercise it? Okay. Tell me why. Correct. Because that's how the government itself interprets the MOUs. If you look at the government's declaration, ER-149, paragraphs 38 and 39, the government describes how these third party transfers occur and it says even under the MOUs, these third party transfers, all that happens with these third party transfers, the government sees the state council's annual plans, all those council plans have to say is who we're going to give the money to and that it's going to be consistent with the feedback and that it signs all funds. But the MOUs... Let me address you. I'm looking at RCAF-48, ER-282, subparagraph B-1. MBC agrees to... This is the Montana Beef Council Plan. MBC agrees to submit to AMS, which is the Department of Agriculture entity, for preapproval any and all promotion, advertising, research, and consumer information plans and projects. Doesn't that give the federal entity the authority to accept or reject any advertising that's being made under the program? And the answer is no, your honor. And that's because for two reasons. One is, as I just said, the government doesn't understand the MOUs to give them that authority. And two, that's impossible for these transfers. When this money is handed over, and I'll point you to ER-311 to 318, it's handed over to these third parties and the third parties are told, go out and spend the money however you like. Tell us afterwards how you spent it. We asked the government and we asked interveners for records showing what you reviewed and approved of this. They weren't able to find us anything. They do not review and approve the speech. They don't have the authority. The Ninth Circuit authority says that we look to the authority to control, not to the actual exercise of that control. Isn't that correct? Judge McEwen's two opinions. No, we are not disagreeing with that, your honor. What the problem here is that this authority, the MOUs do not govern these transfers. That's what the government has specifically said repeatedly and that's established in the record. Again, I can point you to their own declaration. In addition, you also can look at ER-9899. I've read the declaration. The government surely hasn't said in that declaration that the MOUs don't cover these activities. What you've read from that declaration is that the government doesn't exercise its authority to cover those activities because of the way they actually work, which strikes me as an applied claim. But I don't see anything in a declaration where the government says we concede that these activities are not covered by the MOUs. That's your spin on, or reading, spin is a bad word, your reading of the declaration, is it not? Well, I would respectfully disagree, your honor, but let me just say- So point to me where in the declaration the government, or anywhere in its briefing, the government concedes that the activities of the third party contractors are not subject to its regulation under the MOUs. So if you look at paragraph 38, what it describes is that at times QSBCs pay checkoff funds, which the government characterizes for membership dues. We disagree with that. Depending on whether the QSBC is subject to an MOU, either the B4 or AMS reviews these expenditures in advance through their oversight of each QSBC's budget and marketing plan. That's what we're saying actually occurs. We agree that actually occurs, that the government reviews the marketing plan, but what happens is the government then distinguishes that in the next paragraph. If a QSBC engages with these organizations for the purpose of generating communications materials or other deliverables, those materials are subject to AMS review and pre-approval under the terms of the MOUs. These transfers are not for communication materials or other deliverables. No, I asked you a very different question, so I want to rephrase it carefully. You say the government concedes that it lacks the power to review the messages given by third party contractors. What you've read to me is a procedure under which they seem not to exercise that authority, but I'm trying to find where in the record the government says, we couldn't do it if we wanted to. Well, Your Honor, if you're looking for that statement, I agree with you, that is not in the record. Okay. So let's just now assume for a moment that the face of the MOU gives them that power if they wanted to exercise it. I now will return to Judge Tallman's question. Under Judge McEwen's decision, and it was the pistachio case, Paramount, isn't that sufficient to make it government speech? The problem here, Your Honor, no, I do not believe so because of the way these transfers occur. Even if the government had that power and wanted to exercise it, it allows the transfers to occur in a way that it can't exercise. It's not that it simply chooses not to. The actual way these transfers occur is the money goes to the third parties and they only need to tell you afterwards how they spent the money. The government could nominally have a pre-approval authority, but if it's saying what happens is you turn the money over and third parties can spend it how they choose, how could the government ever pre-approve it? By decertifying the council as provided in the MOU. So MOUs only allow them to decertify the council if the government determines that the councils are spending the money inconsistent with their obligations under the MOUs. The government said this is consistent with their obligations. So if we agree with your argument that they're not spending the funds appropriately, do you agree that under the MOU the department has the authority to decertify? I would agree that the government would then have the authority, but it's not the position they've taken. Well, then let the government tell us what position they've taken and then we'll decide whether they've actually taken it. But my concern is this one. Are you making an as-applied claim but not a facial claim? That is correct, Your Honor. So you think facially this statutory scheme with the MOUs passes First Amendment muster. You just think that in certain circumstances or in what evidence did you put on on this issue if you're making an as-applied claim? We put on, so it is an as-applied claim, Your Honor, and we make that very clear in our complaints, which I believe are at 423 of the record. And what we put on is the evidence that shows that this money is, that the government signs off on these plans, these annual plans. All those annual plans say is that the money is going to be spent by a third party consistent with the BFACT. And that's the government's example of one of those annual plans, ER 123. And then we've asked the government and intervenors for what they show us they know actually is spent here and they weren't able to produce anything. And you have also ER 311 and 318, intervenors' own statements that the money is handed over. So now I still get back to Judge Tallman's question, which I'm not sure, and maybe you've answered it and I just missed it. Judge McEwen's decision in the Pistachio case, the Paramount case, says as long as you have the power, the fact that you don't exercise it doesn't render this non-government speech. We may have a negligent executive branch under any president. So why does this now become compelled speech simply because the government failed to exercise a power that I think you concede the MOUs give it? So for these transfers, Your Honor, we are not conceding that the MOUs get this money. Okay. So now I'm back to the same question that I thought Judge Tallman asked at the beginning. He read the MOUs, I've read them, and at least on their face they seem to say, you're ours, buddy. Once you take the money, we can police your messages, we can overturn them, we can take away funding for not complying with our policies. And what you say is, well, that's what the MOUs say, but that's not what they actually do. So counsel, following up on that, that's been my issue with this case. There is no evidence in the record that any third parties are actually spending this money on their own speech or something that would be inconsistent with the VFACT. Isn't that correct? So let me take those. They're two slightly different questions. First answer, yes or no. If there is evidence, tell me what it is. The answer is, yes, there's evidence that they're spending on speech. No, there's no evidence that they're spending it inconsistent with the VFACT. That was the two different points I was trying to say. Okay. Right. But the money is, what they hand the money over for is to spend it on activities pursuant to the VFACT. Activities pursuant to the VFACT are by definition speech. That's what the government, that's what the Supreme Court said in United Nations. But it's the speech that's preferred and authorized by the government, right? Under the VFACT. It's, it is speech. It is, it is authorized by the government. Yes, Your Honor. What this court said in Delano Farms was that authorization was not sufficient to turn it into, or at least that's how we would read Delano Farms, not sufficient to turn it into government speech. But it is so long as there's, I was on, I was on the panel that decided the pistachio case. And, and I think the characterization that judges, I'm sorry, Hurwitz and Teller are giving it is correct. So the combination that there's no evidence that it's not speech, it's not inconsistent with the VFACT and the power, the effective power in the federal government to, to pull the reins if it's, if it, if it, those bounds. Why isn't that enough? So, because our point is the government doesn't actually have the power to pull the reins over these, these expenditures. That what you're saying is that the government has the power to pre-approve when it wants. And we, I agree with you, that is true of expenditures by the state councils and their own contractors. What happens here, and this is what the district court agreed was happening, could happen under statutes and is in fact happening based on this record, is money's turned over to another party and the government is not allowed, is not told in advance how the money is going to be spent. There's no way it could pre-approve. But does it have to have pre-approval? Does it have to have pre-approval authority to satisfy the constitution? Or is it sufficient that the government has the power to punish those who speak contrary to its views? So the, no case of this court has ever said that the power to punish is sufficient. This court has been reluctant to articulate a clear right-wine rule, but the disband power has always been in conjunction with other powers that are not present here. So for instance, the court has pointed to the power to appoint the individuals who actually are making the speech. That's not true of these third parties. Your government does not appoint these individuals nor can it remove the individuals. Counsel, let me, let me focus your attention. This is the Paramount Land Company case, 491 F. 3rd at 1011 to 1012. Our panel in that case wrote, although the secretary has not rejected or edited proposals or taken a particularly active role in meetings, this passivity is not an indication that the government cannot exercise authority, citing to Johans, focusing on effective control. The secretary, through his staff, retains authority to control both the activities and the message. The fact that he has not played an active role cannot be equated with abdication of his role. Just as the secretary of agriculture does not write the copy of the beef advertisements himself for the beef board, neither should such oversight be required for California, for the California scheme to pass constitutional muster. Aren't the facts here exactly the same as were before our before our panel in the pistachio case? No, your honor. In the pistachio case, the plans the government approved. And for this, I would point you to, I believe it's in the same section. It's 1011. The plans the government approved are described as having a significant amount of detail. For example, they include a general description of the advertisers, details of the themes the actors to be used, the demographics to be targeted, and the media to be employed. The plans here, and this is, again, based on the government's own submission, exhibit ER 123 is the government's own example of what a plan looks like that it reviews. It's all they say is we're going to turn money over to these third parties. They're going to spend it consistent with the beef. What's happening in Johans, I'm sorry, what's happening in the pistachio land case is what the court's saying in our reading, at least, is that if you do something equivalent to reviewing each individual statement, reviewing an annual plan, that's close enough. That's not what's happening here. I also would point out that even in the pistachio land case, the government had the power to appoint one individual, had the power to remove one individual, had the power to control all the nomination and selection and election procedures. That's not true of these third parties. But the next paragraph, the next paragraph at 1012 says we acknowledge that there are but these factual differences are legally insufficient to justify the injunction. To draw a line between these two approaches to oversight risks micromanaging legislative and regulatory schemes, a task federal courts are ill-equipped to undertake. The message set out in the pistachio promotions is from beginning to end the message established by the state government. Why doesn't that language control it? We think it does, Your Honor, but it's not meant. The message here is not from beginning to end that of the government. What the court in the pistachio land case, Paramount land case, excuse me, found was that the actual controls that were there, not the ones that were used enough, but the actual regulatory controls that were possible were sufficient for the government to control the speech from beginning to end. Here, you might have control over the beginning. The government certainly signs off and make sure that the speech complies with the beef act, but it has no control over the end. When the money is turned over to these third parties, it cannot know what's going to be said because it's not given any information about what's being said. It allows the money to be turned over and expended by these third parties without any information about what's going to be said. Under the, with the MOUs in place, how is the state checkoff program different than the federal checkoff program addressed in Johans? So this is an as-applied challenge. I don't know all the details of the federal checkoff program. Well, because I'm reading, I'm reading, I've reread Johans several times and it seems to describe all the kinds of control that the MOUs give here. It doesn't seem to say, and you also have to, you have to be involved at the level when the messages are sent out. It talks about unexercised powers and things like that. So I'm wondering whether Johans doesn't, doesn't decide this issue for us given the facial powers that the secretary has. Am I wrong about that? I think, again, I think you're wrong because again, what we're focused on are these third party transfers. I agree with you. And for this purpose of this bill, our cabinet is agreeing that the state councils own use of the money. When the state councils spend the money themselves, when they hire an ad agency to spend the money, that is now equivalent to what occurred in Johans. This is what's happened though, is there is a separate bucket of money. That's the focus here. And if that separate bucket of money- No, I understand. So I understand. But Johans says when the, when the state agency hires under the federal program, somebody to promote a message, that's okay because the secretary has, in effect, ultimate control of the message. The scheme seems to be exactly the same as the scheme here once the MOUs have been added to the scheme here. So I'm trying to figure out what's the, what's the facial difference between the scheme in Johans and the scheme here? The difference is that in Johans, the secretary did have ultimate ability to sign off on the You're saying the secretary, I thought what you said is the secretary has the ultimate power, but the way the thing is structured is he really doesn't have the ability. Is that, is that real? Is that your position? Our position, our position is that reading the, this is a case on summary judgment or reading the facts and the record, there's at least a dispute of fact about whether the government interprets the MOUs at the way we believe they are, the way you're characterizing them. But even if that were true, even if the MOUs gave them that power, functionally they can't. That power cannot apply to these third party transcripts. Okay. But I keep coming back to Johans. Wasn't that really true in Johans? There wasn't any evidence in Johans that, that the messages at the end of the day were approved by the secretary in advance. He just had the power to. So why does that make a difference? Is I guess my question. Well, so two answers, Your Honor. One is our, I believe in Johans, there in fact was evidence that the secretary did in fact edit the statements himself and participated in their crafting. I'm trying to find that site for you. Okay. And I could be wrong about the record and I can go back and look at that. But the other answer is that again, with these, not with some of the speech, but not with the state council's expressions, not with the contractor's expressions, but with the third party transfers, the government doesn't have the ability to ever sign off on the speech ahead of time. What's happens is the money is handed over and the third parties are told, do with it as you like. And then what is occurring is that the third parties issue the speech and the government only finds out after the fact. Again, we've asked the government and interveners to show us what they actually sign off on, what they know they weren't able to produce. There's no, the government doesn't have anything that they could ever point to because they doesn't know what the speech is. And I agree with you that the court has a lot of flexibility. But that argument still goes to whether or not they've exercised control, not whether or not they have the authority to exercise that control. Certainly the last point does, Your Honor. My first point in that was that the government, because of the way it allows these transfers to be structured, doesn't have authority. Under the MOU, could the government condition its pre-approval of the funds to the third parties on a requirement that the government actually see the copy? The MOU certainly could be rewritten that way. And that would, I think, satisfy a lot of our concerns. Again, because of the way these transfers are structured, I don't think unless they change the nature of the transfers, they actually could demand that authority or insist on that. Right. Okay. But they could rewrite the MOU to do that if need be. Okay. Thank you, counsel. You're over your time. I guess I have a question for Ms. Powell. I don't see a third person. Is counsel Andre planning also to speak? Yes. Mr. Andre, I don't know if his camera might just be off. I know he was having trouble controlling the camera. So it might just be that it needs to be unmuted. Okay. All right. All right. There, I see him now. Okay. Ms. Powell. Thank you, Your Honor. This is Lindsay Powell for the government. I don't want to belabor points that have already been covered here. But since much of this one remaining merits issue in the case really does come down to the extent of effective government control. I do want to briefly address what control there is with respect to these third-party payments. As the court has noted, there are many different facets of it. To begin with the issue that the court begins with in all of these cases in Johan and Paramount and Delano Farms, there's statutory and regulatory control with respect to the message. And there's no dispute here that any promotion that would be funded this way would have to comply with that overarching message and the various prohibitions that were established by statute there. And that's a significant factor. But your friend says you don't have under the MLUs the ability to pre-approve the message. So I asked, and he says he's made representations about what positions the government's taken or not taken. So I'm asking, do you have, whether or not you exercise it, the legal authority to pre-approve messages by third parties under the MLUs? Insofar as, and we're talking here only about third parties that don't have a contract with the state councils, anybody that's in contract that's being hired to put together an advertisement which is going to be most folks putting together ads would have to have a contract. And then, yes, there is pre-approval authority with respect to- So now with respect to the other group that you just described, what's the secretary's authority in advance of the message? Yes. So the principal authority in advance of the message is to attend the meetings at which the decision to fund, provide payments to these entities are made. And then it has pre-approval or disapproval authority with respect to those budgets. So if there's a line item in a state council budget that says we're going to give a payment to a third party, USDA gets to look at that and determine whether it's comfortable. And there's a point here that I think is really significant that may not be, you know, sort of jump out of the briefs. It is discussed in our brief at pages 20 to 21. But we're talking about two institutional actors here when we talk about third parties. We're not talking about third parties generally or, you know, folks with no connection to the government. So these are both entities that are referred to in the statute. The Federation of State Beef Councils, by statute, has the authority to appoint a full half of the membership of the Federal Operating Committee. It's a close relationship with the government. USMEF similarly contracts frequently with USDA. And I'm impressed that the funds that are paid to USMEF through this means, line items that we're talking about in these state council budgets, are used to fund projects that have been approved, developed by the Operating Committee and approved by USDA. So there's sort of a closed universe of entities and payments here. This is not just, you know, I think the term shell game appears in the other party's brief. And this is not that by any means. This is not a pass through to random groups with no connection to the government. These are state councils that themselves engage in promotion pursuant to the terms of the act, pursuant to the terms of the MOU. And then these payments are made to these institutional actors. In addition, subject to all the review requirements that we've talked about, there's the budgetary review, attendance at these meetings, and, of course, the oversight that's been discussed already, the risk of decertification if a council were to make an inappropriate. I think I asked a narrower question, and I think you've implicitly answered it. There's no pre-approval is not exercised with respect to the specific speech of these third parties. You may remove funding if you don't like their speech. You approve budgeting plans. You approve general marketing plans. But with respect to the specific speech of these third parties, the government doesn't pre-approval. Is that fair? That's fair. And that's entirely consistent with Delano Farms. I think that's the closest. Because my next question was going to be, does that pose a problem? And you think not. Absolutely not, Your Honor. So if you look at Delano Farms, the court there considered two principal features. It looked at the extent to which message was controlled by the statute and regulations, and it looked at oversight authority that the secretary retained with respect to the and removal power there. But the court specifically noted that there was not a type of editorial control that we're talking about here. And there was no suggestion, if you read Johann and Paramount Land, there's no suggestion in those cases that editorial control is necessary. It was present in Johann. It was present to a significantly lesser extent in Paramount Land, where you're talking about an annual statement of activities that the secretary was able to review there. But in Delano Farms, there wasn't even that. There's no budget review. There's no review of editorial content. So this notion that word-by-word approval, the ability to control the message to that extent, the idea that that's constitutionally necessary is false. Delano Farms would have had to come out the other way if that were true. And so under the authority of Delano Farms, it's clear that the control here is sufficient, even without that editorial control. Counsel, it's actually Delano. Oh, thank you, Your Honor. You're welcome. That's because it's a Georgia name, not a Franklin Roosevelt name. Exactly. I would also note that there is an alternative grounds for affirmance here that's available to the court, should it need to seem more straightforward. But that is the availability of these opt-out procedures. And that provides a straightforward way of affirming the judgment of the district court, which was to uphold this program as constitutional. We did not need to cross appeal in order to argue for affirmance on other grounds. And contrary to the plaintiff's suggestion, the Knox decision is absolutely consistent with finding the opt-out adequate here. Knox acknowledged that the court has approved opt-out procedures in the past. And the problem with the specific procedure in that case is that it didn't provide a meaningful opt-out. There was a Hudson notice given at point in time A, and then at a later point in time, a new assessment was issued, and there was no opt-out provided for that second assessment. So it's wholly unlike the situation we have here, where sophisticated industry actors who are continually making improvements on check-offs are knowledgeable of the options available so that they can make that affirmative choice. Whether to have the entirety of their check-off go to the federal government, where the controls are completely constitutional, or whether to allow 50 cents to be retained by the state councils, potentially for use of these check-off payments. So, but the district court didn't rule on that basis, correct? That's correct, Your Honor. It didn't, but it has been fully briefed and is available as an alternative ground. Another thing that I'd like to just sort of clarify is, so the way this case has come to court has been somewhat strange. The actual issue that you're being asked to focus on exclusively here occupied only three paragraphs of the plaintiff's summary judgment briefing, and it has really shifted over time. But if the court were to think that there were some issue with these third-party transfers, it's imperative to be clear about what relief would be warranted. Took issue with payments made to support membership on these federation and USMEF. Even here, they're sort of, it's clearly just a First Amendment challenge, and yet the payments that they're taking issue with are not limited to First Amendment activities or for promotion. But I think any relief, if the court got to that point, which of course we don't think it should, but it needs to be precise that what we're talking about are third parties, not in contract with the state councils, only for promotional purposes, which really isn't even most of the transfers that they're talking about. I'd understood, maybe I was wrong. I'd understood the attack also to be on payments made to third parties in contract with the state councils, but- No, Your Honor, that's not- That's now gone. That's now gone. Plaintiff's counsel can confirm, but my understanding is that- No, I heard him say that, but I hadn't necessarily read that from the briefing, and that's why I was asking you. Yes, there is the editorial control, the opportunity for- No, I agree. I agree. I still thought they were attacking it in reading their brief, but now I understand that I overread their brief. Okay. Yes. No, so this is indeed a very narrow challenge at this point, but given the moving target that's presented and the points of imprecision, I just wanted to take care to talk about what relief would actually be warranted if the court got to that point in the analysis. Of course, we don't think it needs to. I would note that the only other time one of these cases has raised an issue of third party payments like this was in Paramount Land, where there was a challenge raised to payments that were made to a political consultant and then who in turn hired lawyers to engage in government relations activities, all of which is expressive, none of which was subject to word-by-word editorial control. The court didn't separately engage in an analysis of those third party transfers and the control at every point in that it focused on the secretary's control over the pistachio commission in general and finding that control to be adequate. It ended the analysis there, and the court can do the same thing here. I think it raises a slippery slope issue, the type of issues of micromanagement that the court cautioned against in Paramount and Delano Farms that the court would do well to avoid and that the case law makes it harder to engage. I would also be happy to talk about the appropriateness of the other form of injunctive relief the plaintiff is seeking, if the court wants to discuss that or our standing argument. I thought the standing arguments, in effect, doesn't really address our analysis of the merits, since everybody agrees they're standing as to a majority of the beef counsels in the case. And so if we were to issue a ruling as to one of them on legal grounds, it would surely apply to the others, even if the members of our California made check-offs to them. Didn't we grant standing to crustaceans and saltwater in one case? Oh, gosh. All right. So there's no need for that. We'll hear from Mr. Andre now. Yes. Thank you. Good morning, Your Honor. Jean-Claude Andre, on behalf of the Intervenors Appellees. The Intervenors Appellees are four QSBCs that have been promoting beef at the state level for between 65 and 35 years. That is, some of them from well before the Beef Act and order went into place, plus three independent cattle ranchers from Montana. They intervened in this case because, in the prior appeal, the MOUs were not considered by the district court or by the majority of this court. And we share Judge Hurwitz's view that the finding of waiver there was somewhat mystifying. I believe that was Judge Hurwitz's word. But so in any event, because life- By the way, I lost on that argument, so never cite the dissenter. He's back. But since life under the MOUs is so important to our clients, they decided to intervene and wanted to present evidence about what that life was like. And they appreciate the opportunity the district court gave them to present that evidence and explain how checkoff funds are used at a more local level. Of course, the magistrate judge and district court went our way, finding that this case was like Delano Farms and Paramount Lands, and we urge this court to do the same. I guess I share Ms. Powell's sentiment that I'm happy to address issues like the injunction, which nobody has covered today. But I'm also happy to, I guess, just, you know- I have a question for you under the MOUs. For this category of third-party contractors, I don't know, third-party entities that are not contractors, what sort of measures are there to control the nature of their expressive activity? Well, I think the answer is, I think, perhaps the one that Judge Hurwitz gave, perhaps his own question earlier, which is that when you're talking about the non-preferred providers, right? I mean, at the Federation and the USMEF, they're preferred providers under the Act. But if you're talking about whoever these additional third parties may be, right, you know, whether it's an independent media consultant or, you know, Kinko's, the oversight that the Secretary would have would be to participate in the meetings of the QSBCs where the line budget items relating to expenditures going to them are discussed, to then approve the budget where those line items are entered, and then on the back end to conduct an audit and say, wait, we didn't like that, so fix it, or never do that again. And, you know, as Ms. Powell has explained, and it sounds like the Court may be leaning this way, that that is sufficient control from beginning to end under the Johans test, because the Johans test is pretty simple. It's got two parts. Does the government set the message? Yes, the government set the message here. And, in fact, Mr. Morescan concedes that. And then, you know, are people who are accountable to a political appointee delivering the message? And because what the MOUs do is solidify the fact that the QSBCs are effectively now an arm of the USDA, it is the same analysis that the Court engaged in in Johans where it just looked at the beef board versus the QSBCs. Now we have essentially a bigger beef board that includes the QSBCs, and we're just looking downstream a little bit, but the analysis is the same. The Secretary can approve the items conceptually on the front end and then knock them down on the opt-out. Is it correct that any beef producer can entirely opt out of giving their money to the state QSBCs? Yes, so they can opt out, and they don't get to keep it, so it's not like an agency shop arrangement where the employee essentially pays, you know, less. They can opt out, and what that means is that the full dollar will then go to the National Beef Board as opposed to $0.50 going to the local QSBC. I want to address that issue which hasn't come up in the district court or in the previous iteration of this case here. How does, if one has an unconstitution, if we have two programs, one's constitutional and the other one isn't, and I know you think both were in this case. Is it enough to say to the beef producers, choose whether you want to give the money to the constitutional program or the unconstitutional one? Does that solve any problem? I mean, I would think absolutely, because all they have to be alerted to is the fact that there's a First Amendment issue and then make a voluntary informed choice as to what to do. I mean, the And so to the extent that this court were to find that part of the program, as you said, Judge Hurwitz, was unconstitutional, then the option to shuttle the full $1 tax, which is otherwise independently constitutional, to shuttle it all to the constitutional component, that solves the constitutional problem. And at least we now know that the, we know the Supreme Court's told us the federal program is constitutional. Absolutely. Of course, we believe that the All right. Well, thank you, counsel. Mr. Muraskin, I'll give you two more minutes. Thank you, Your Honor. I think there are just two points I'd like to make. One is, having heard from Ms. Powell, you can now see that there's, the controls that are at issue here are less than every other case. What the government has said is that it can attend the meetings where the budget's set and it can approve the budget. And if you look at it again at the declaration, they say the budget's going to have a general description of the activity. No case has ever said that's enough. The Delano case had two different types of controls. The government appointed and could remove every single person on the commission that was making the speech, which is not true of these third parties. And the court said the statute went much further than the BFAC, specifically compared the statute at issue in Delano to the BFAC and said this statute goes much further in directing that speech. So to say this is like Delano is not at all consistent with the text of the case. It does provide for budget approval, pre-approval of projects and material, maintenance of books and records, annual audit, offices. I'm sorry, I don't know where you're looking, Your Honor. The MOU. I'm looking at the subtopic headings, pages one, two, and three, which is ER 281-282. Basically what the MOU lays out that the government has the authority to do should it choose to exercise that authority. Yes, Your Honor, we don't disagree that the MOU applied. That would be sufficient. But what, as Ms. Pollack explained to you, the MOU's powers do not apply fully to these third party transfers. That they lose the ability to do a set of things, particularly to review the speech. The other point I want to make quickly is about NOCs, which is that the opt-in, opt-out has been very clearly held. You have to opt-in. That's explicitly what NOC says. You need affirmative consent for their First Amendment rights. That's what JAN has said. You need affirmative consent. That's what the government said, and it's brief in JAN. You need affirmative consent. And so the notion that the opt-out here could solve anything is incorrect. You need to actually have people opt-in where there's a First Amendment issue in place. I see I'm out of time. Okay, so let me ask the question then. If the program said you must opt-out of the federal program, otherwise your money goes to the federal program, you'd have no problem with it? If the program said the money would go to the beef board or stay at the state councils, unless you opt-in to going to another party, yes, we'd have no problem with that. Okay, but to phrase it phrase it differently. If the statute says your money will automatically go to the federal program, found constitutional in Johans, unless you choose to have it go to the state program, you would have no constitutional objection to that scheme? We would have no constitutional objection to that scheme. That's correct, Your Honor. All right, thank you, counsel. Rangers-Catlin Action Legal Fund versus Purdue will be submitted. And this session of the court is adjourned for today.
judges: Wardlaw, Tallman, Hurwitz